## Warren, Appellant, v. Prager.

Argued November 17, 1961. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN and ALPERN, JJ.

*Paul Brandeis,* for appellant.

*Benjamin F. Kivnik,* for appellees.

Opinion by Mr. Justice Musmanno, January 2, 1962:

On May 4, 1954, Ethel Warren signed a judgment note for $13,901.30, payable to Samuel Prager. After paying off $10,153.47, Mrs. Warren filed a petition to satisfy the judgment, alleging an "amorous relationship," which will be referred to later at length. Upon answer filed, depositions were taken, and the court finally discharged the rule to mark the judgment satisfied. Mrs. Warren appealed to this Court which dismissed the appeal because no appellate review lies from the discharge of a petition filed under the Act of March 14, 1876, P. L. 7, stating further that: "A remedy available to a judgment debtor, if the creditor improperly refuses to satisfy the judgment of record, is afforded by the procedure authorized by Section 14 of the Act of April 13, 1791, 3 Sm. L. 28, 12 P.S. §971." (402 Pa. 128)

Mrs. Warren then entered a suit in assumpsit under the Act of 1791,* which terminated in an agreement judgment against Mrs. Warren. She now comes to this Court for the second time.

The depositions filed in the court below authorize the following narrative of facts. Mrs. Ethel Warren was employed as a bookkeeper for some years by Samuel Prager, in which employment she came into contact with money paid by customers who dealt at her employer's store. At some time prior to May, 1954 (the exact date not appearing in the record) an audit of the firm's books revealed a shortage of $13,901.30, the circumstances pointing to Mrs. Warren as a peculator of the missing funds. She confessed to her employer that money received from customers had been diverted to her purse and promised to restore what she had taken.

---

* This suit was instituted against the executrix of the estate of Samuel Prager, he having died in the meantime.

She accordingly signed the judgment note which is the subject of this controversy.

She made periodical payments against the indebtedness until she had paid to Prager the sum of $10,153.47 when she ceased further installments because she said that Prager had been an accomplice in the embezzling process. This startling statement she embellished with a melodramatic account which included an extra-marital romance, a rejected suitor's revenge and blackmail.

She testified, in a deposition, that she and Prager, who was a married man, often went to New York together, tarrying along the way at a motel in Avenal, New Jersey. On one of these trysts, a ne'er-do-well by the name of Ricky Rothberg took pictures of Ethel and Prager entering and leaving the motel. Rothberg had been a fiancé of Mrs. Warren's daughter and when Mrs. Warren refused to give her consent to his marrying her daughter he vowed revenge. The photographs followed and blackmail reared its ugly head. You either pay me money or I'll show these pictures to Prager's wife, Rothberg threatened, according to Mrs. Warren. She emptied her personal treasury to him which at that time contained from $1500 to $1800, she said. This ransom, however, did not satisfy Rothberg's revenge and he continued to haunt her, always brandishing the incriminating pictures which have not been reproduced in the record nor orally described.

Mrs. Warren, now at the end of her resources and her wits, told her paramour Samuel Prager what was taking place. He did not seem worried by what she related. She threatened she would not go to New York with him anymore but he took this all "with a grain of salt."

Rothberg's shadow continued to darken Mrs. Warren's path so she again went to Prager. This time she showed him the pictures and he laughed. He said that Rothberg would never go to his wife to acquaint her

with his dark knowledge. However, according to Mrs. Warren, the matter got "real serious." She didn't explain how this increased seriousness came about since she now had the pictures, but of course it is possible that Rothberg had retained the negatives.

Prager now began to feel the chill of a breaking scandal and said, always according to his worried mistress, that he would help her. How? "See what you can do to the books," he counselled her. And Mrs. Warren went to work on the books. In the meantime, however, the relentless Rothberg continued to show up with his sack to receive further blackmail installments. In the final accounting he had collected from his former intended mother-in-law the sum of from $13,000 to $14,000.

It was about this time that the auditor arrived and discovered the game which Mrs. Warren had been playing with the firm's books. Mr. Axelrod, the certified public accountant, asked her how this had happened. She was about to tell him when Mr. Prager, who was in the office with Mrs. Prager, frantically waved his hand to her and put his finger to his lips.

Axelrod, according to Mrs. Warren, insisted she sign a judgment note. Prager, who had now moved closer to the scene, standing by the water cooler, instructed her not to say anything—and she signed.

And then every Friday or Saturday she would pay Prager something on the note, at the same time, on Thursday afternoons and Saturday nights, called at Prager's home because Mrs. Prager "wouldn't be there."

This is the story Mrs. Warren told as to how she came to sign the note. Even if her story had elements of truth, the question arises as to whether a chancellor's conscience could be prevailed upon to employ equity powers in a transaction which the debtor admits was one which transgressed conscientious behavior and the moral code, as well as the criminal law.

However, there is no need to enter into that field of decision because the chancellor found, with good cause, that the petitioner's account of what happened, was a fabrication. He said that her "basic tale of the blackmailer itself falls apart upon analysis. She would have the blackmailer preying on herself, a salaried employee, rather than on her participant in the affair, a married businessman, even though she claims that the blackmailer threatened to tell her employer's wife. She allegedly purchased some incriminating photographs, but she did not know whether she had given them to her employer, whether they had been destroyed, or what had happened to them. She continued her affair even after the blackmailer allegedly appeared, tossing off any apprehension that he would come again."

Although Mrs. Warren testified that Prager had agreed that he would pay one-half of the amount which had been embezzled, yet, according to her story, she paid $10,153.47, considerably more than the one-half she would have been required to liquidate, before she called a halt to the imposition. Moreover, she testified that on one occasion, September 9, 1955, she paid Prager $5,000 and he gave her a receipt for that amount. The court below found that the amount she really paid on that day was only $20, and that the receipt had been altered in a crude forgery attempt to make it seem like a payment of $5,000. Although she was supposed to have paid this amount in September, 1955, she made no mention of this large sum until some three years later. Her explanation for this silence was that she had forgotten about the $5,000 payment! The court properly observed on this item: "The final straw which convinces us that the story of the $5,000 receipt is a fabrication is that defendant never disclosed the receipt from the time that she allegedly secured it in 1955, notwithstanding that she received accounts from the plaintiff which showed no credit for the $5,000, and

notwithstanding demands from the plaintiff [Prager] for payment of the full amount without credit for the $5,000. Her only explanation in the depositions was that she had completely forgotten about the $5,000 credit. Her story falls apart because, with the $5,000 credit, defendant would have overpaid her 'share' of the obligation if the transaction were as she said it was."

The appellee asserts that aside from the merits of the case as above discussed, Mrs. Warren was barred from proceeding under the Act of 1791 since the issue in controversy was decided when the Court dismissed the petition to satisfy the judgment under the Act of 1876. We do not need to pass upon that question because it is clear that the court below did not abuse its discretion in refusing to give credence to the plaintiff's version of the circumstances surrounding the execution and payment of the judgment note.

Judgment affirmed.